IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


SAMANTHA N. DEDMAN                                                    PLAINTIFF


v.                              NO. 3:15-cv-00107 PSH


CAROLYN W. COLVIN, Acting Commissioner                               DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER


       Plaintiff Samantha N. Dedman ("Dedman") began this case by filing a complaint

pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the

Acting Commissioner of the Social Security Administration ("Commissioner"), a decision

based upon findings made by an Administrative Law Judge ("ALJ").

       Dedman maintains that the ALJ's findings are not supported by substantial

evidence on the record as a whole and offers two reasons why.[1] Dedman first maintains

that the ALJ committed error at step three of the sequential evaluation process.

Specifically, Dedman maintains that her intellectual impairment meets Listing 12.05C,

and the ALJ erred when she failed to so find.

---

[1]
       The issue at bar is whether the ALJ's findings are supported by substantial evidence on the record
as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person
would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step three, the ALJ must determine whether a claimant's impairment, when considered individually and in combination with her other impairments, meets or equals a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that her impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 12.05 addresses intellectual disability, formerly referred to as mental retardation. The introductory paragraph of Listing 12.05 explains that the disability encompasses "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, the evidence demonstrates or supports onset of the impairment before the claimant's twenty-second birthday. A claimant meets Listing 12.05 by satisfying the requirements of the introductory paragraph and one of four paragraphs contained in the listing. Paragraph C, or 12.05C, requires proof of a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." The formal diagnosis of an intellectual disability is not required. The ALJ is not obligated, though, to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). "Indeed test results of this sort should be examined to assure consistency with daily activities and behavior." See Id. [internal quotations and citation omitted].

-2-

The evidence relevant to Dedman's intellectual abilities reflects that in June of 2011, she was seen by Dr. Anita Gail Wells, Ph.D., ("Wells") for a mental diagnostic evaluation and intellectual assessment. See Transcript at 265-271. Wells administered Wechsler Adult Intelligence Scale-Fourth Edition testing, and Dedman's scores included the following: a verbal comprehension index score of seventy, a perceptual reasoning index score of sixty-nine, and a full scale IQ score of sixty-one.[2] Wells observed that the scores were consistent with Dedman's "abilities testing," and it appeared that the scores were a "fair evaluation of [her] achievement." See Transcript at 269. Notwithstanding Dedman's scores and Wells' observations, Wells found the following with respect to the effects of Dedman's intellectual impairment on her adaptive functioning:

> **How do mental impairments interfere with this person's day to day adaptive functioning?** [Dedman] has a payee. However, she can shop independently. She completes grooming and dressing independently. She can cook, however, generally uses the microwave as she is "afraid" of the stove because she was responsible for burning her family's house down at age 4. [She] has never taken her driver's test. …
>
> **Capacity to communicate and interact in a socially adequate manner?** During today's interview, [Dedman] demonstrated no difficulty with communication. Writer noted that [Dedman] related in an immature manner at times. She appeared to be a good historian for personal history. She stated that she has several friends. She also explained that she has met several friends "on the internet" then recanted and stated that she hardly uses the internet because "I don't understand it."

---

[2]

The phrase "verbal comprehension index" has been substituted for the phrase "verbal IQ," and the phrase "perceptual reasoning index" has been substituted for the phrase "performance IQ." See Pierson v. Colvin, 960 F.Supp.2d 933, 937 n.5 (S.D.Iowa 2013).

**Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?** There was no evidence of inability to cope with typical mental/cognitive demands of basic work-like tasks.

**Ability to attend and sustain concentration on basic tasks?** [Dedman] appeared to have good attention and concentration during today's evaluation. She appeared to be a good historian for personal information.

**Capacity to persist at tasks until completion?** [Dedman] has not obtained her driver's license. She has not obtained her GED. She has never worked.

**Capacity to complete work-like tasks within an acceptable time frame?** [Dedman] displayed intact speed of processing for both mental and motor tasks on examination today, consistent with IQ, and educational history.

See Transcript at 271. Wells weighed a number of factors, including Dedman's level of adaptive functioning, and opined that Dedman was not functioning within the mentally retarded range. With specific regard to Dedman's IQ scores, Wells observed the following:

… [Dedman's] FSIQ [i.e., her full scale IQ score] [is] 61, which indicates a level of intellectual efficiency in the extremely low range. However, her VCI [i.e., verbal comprehension index IQ score] of 70 and PRI [perceptual reasoning index IQ score] of 69 indicate she is currently functioning in the extremely low to borderline range. Due to her history of inconsistent academics, and chaotic living environment, it is more likely that [Dedman's] true level of intellectual functioning is in the borderline range.

See Transcript at 270. On the basis of the foregoing findings and observations, Wells diagnosed borderline intellectual functioning.

-4-

In November of 2012, Dedman was seen by Dr. Beth Meyer-Bulley, Psy.D., ("Meyer-Bulley") for a consultative mental evaluation. <u>See</u> Transcript at 333-337. Meyer-Bulley found the following with respect to the effects of Dedman's intellectual impairment on her adaptive functioning:

> In terms of adaptive functioning, [Dedman] stated she arrived at today's appointment with her "Aunt Kim's mother," with whom she is currently residing. She reported that she never obtained her license. [Dedman] denied difficulty navigating familiar routes, but stated she cannot navigate unfamiliar routes even with directions. She denied problems with activities of daily living and stated she manages her own finances. [She] went on to explain, "I get the check in my name and cash it, but then I give it to my aunt to take care of for me because I'm bad at spending money." [Dedman] described herself as atypical in terms of social interactions. She explained the only friends she has are on the internet.

> With regards to mental functioning, it is my clinical impression that [Dedman's] social and adaptive functioning is limited. She did display appropriate social graces, but displays emotional and social immaturity. [She] was able to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks.

> As noted in the findings of the mental status exam, [Dedman] appears to be functioning at a borderline level of intellectual functioning, at most. Although she demonstrated limited general knowledge, she displayed adequate attention, short-term memory, and verbal associative thinking. She answered all questions and sustained persistence on all tasks. In terms of mental statute type tasks, capacity to perform within a basically acceptable timeframe was demonstrated.

<u>See</u> Transcript at 337. Meyer-Bulley weighed the various factors and opined that Dedman was not functioning within the mentally retarded range. Meyer-Bulley instead diagnosed borderline intellectual functioning.

Dr. Abesie Kelly, Ph.D., ("Kelly") and Dr. Cheryl Woodson-Johnson, Psy.D., ("Woodson-Johnson") subsequently reviewed Dedman's medical records. See Transcript at 98-103, 111-116. Kelly and Wood-Johnson agreed that Dedman can perform work where interpersonal contact is incidental to work performed, e.g., assembly work; the complexity of tasks is learned and performed by rote, few variables, and little judgment; and the supervision required is simple, direct, and concrete (unskilled).

In Dedman's disability documents, she did not allege that she is unable to work because of an intellectual disability. See Transcript at 204. She also self-reported few limitations caused by an intellectual disability. See Transcript at 217-224. For instance, she reported being able to shop in stores, pay bills, count change, and use a checkbook/money orders. See Transcript at 220.

Dedman testified during the administrative hearing. See Transcript at 71-88. She testified that she had difficulty in school and stopped attending only after she was asked to leave. She can read and write but is poor at math. She attempted to work, but her attempts were unsuccessful because she had difficulty getting along with others and "being told what to do." See Transcript at 75. She additionally testified to the following:

> [Counsel]: Now you-it appears that you've identified your inability to get along with others and take orders from others–
>
> [Dedman]: Mm-hmm.
>
> [Counsel]: –that's it's a big problem that keeps you from working.
>
> [Dedman]: Yes.

[Counsel]: Is there anything else about the workplace that aggravates your symptoms or makes you upset?

[Dedman]: If it's not neat it bothers me. I guess you could say I'm a real neat freak.

[Counsel]: So if somebody hired you to work on say as a housekeeper in a hotel, what would keep you-what problems would you expect to encounter?

[Dedman]: Really none of them if somebody would just hire me. Nobody's willing to hire me.

[Counsel]: So you think if they hired you, you could do that job?

[Dedman]: Possibly if nobody was to smart off.

[Counsel]: Is there anything else that keeps you from working other than what you've told the judge about today?

[Dedman]: Not that I know of.

See Transcript at 86.

The ALJ found at step two that Dedman's severe impairments include borderline intellectual functioning. At step three, the ALJ found that the impairment does not meet Listing 12.05C because Dedman does not have a valid verbal, performance, or full scale IQ of 60 through 70 and another impairment imposing an additional and significant work-related limitation of function. The ALJ assessed Dedman's residual functional capacity and, in doing so, gave great weight to the findings of Wells, Meyer-Bulley, Kelly, and Woodson-Johnson. The ALJ found that although Dedman has limited cognitive functioning, she remains functional and capable of performing unskilled work.

The ALJ's finding at step three is not a model of thorough legal analysis as she simply recited the language of Listing 12.05C in finding that Dedman's intellectual impairment does not meet Listing 12.05C. A portion of the ALJ's finding at step three is also error because Dedman has impairments in addition to borderline intellectual functioning that impose additional and significant work-related limitation of function.[3] The ALJ's error, though, is harmless. Substantial evidence on the record as a whole supports the finding that although Dedman has a verbal, performance, or full scale IQ of 60 through 70, the ALJ could and did discount the validity of Dedman's IQ scores. The Court so finds for four reasons.

First, Dedman's IQ scores were the product of her first and only meeting with Wells. "A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." See Clark v. Apfel, 141 F.3d at 1256 [citing Loving v. Department of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994)].

Second, Wells questioned the validity of Dedman's IQ scores. Wells acknowledged Dedman's low IQ scores but given Dedman's history of inconsistent academics and chaotic living environment, Wells believed it likely that Dedman's true level of intellectual functioning is in the range of borderline intellectual functioning.

Third, Dedman's low IQ scores are inconsistent with the adaptive functioning

---

[3]

The ALJ represented that an impairment is severe if it "significantly limits an individual's ability to perform basic work activities." See Transcript at 54. At step two, the ALJ found that Dedman's severe impairments include not only borderline intellectual functioning but also a mood disorder, an anxiety disorder, post-traumatic stress disorder, and a personality disorder. Substantial evidence on the record as a whole supports the ALJ's finding.

findings made by Wells and Meyer-Bulley. For instance, Wells observed that although Dedman has some cognitive limitations, there is no evidence Dedman has an inability to cope with the typical mental/cognitive demands of work-related activities. Meyer-Bulley also observed that Dedman has some cognitive limitation, but Dedman displayed adequate attention, short-term memory, and verbal associative thinking. She answered all questions, sustained persistence on all tasks, and demonstrated an ability to perform within a basically acceptable timeframe.

Fourth, Dedman's self-reports and testimony undermine the validity of her IQ scores. She reported few limitations caused by an intellectual disability. Specifically, she reported being able to shop in stores, pay bills, count change, and use a checkbook/money orders. She also testified that she could work if she were placed in the proper work environment, i.e., one in which she had minimal contact with other people.

Substantial evidence on the record as a whole therefore supports the finding that Dedman does not have a valid verbal, performance, or full scale IQ of 60 through 70. Her assertion to the contrary is without merit.

Dedman offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Dedman maintains that the assessment of her residual functional capacity does not "accurately reflect the true extent of her mental limitation." See Pleading 16 at 17. It is her position that the record is missing several documents, specifically, the documents Wells relied upon in making her findings.

The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36

F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. <u>See Id</u>. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. <u>See Pratt v. Astrue</u>, 372 Fed.Appx. 681 (8th Cir. 2010).

At the commencement of the administrative hearing, the ALJ inquired into whether the record was complete. <u>See</u> Transcript at 70. Dedman's attorney represented that the record was indeed complete. At the conclusion of the hearing, the ALJ again inquired into whether the record was complete. <u>See</u> Transcript at 91-92. Dedman's attorney again represented that the record was complete. In a request for a review of the ALJ's adverse decision, Dedman made no assertion that the record was incomplete. <u>See</u> Transcript at 1-6, 49. It appears that it is only now that Dedman challenges the completeness of the record.

The Court has examined the record to determine whether it contains sufficient information for the ALJ to have made an informed decision. The Court is satisfied that the record contains sufficient information. It contains numerous medical findings regarding the nature and severity of Dedman's intellectual disability. It is not clear what the additional records would show, other than the fact that Dedman struggled in school and has been hospitalized for a mental impairment. There is nothing to suggest that additional evidence or clarification would produce findings substantially different than those presently in the record.

In conclusion, there is substantial evidence on the record as a whole to support the

ALJ's findings. Accordingly, Dedman's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 11th day of January, 2016.

_____
UNITED STATES MAGISTRATE JUDGE